**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**STEPHANIE E. COOK,**

      **Plaintiff,**

**v.**                          **Case No.: 2:13-cv-30155**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13, 14).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's decision be

**AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On April 27, 2011 and May 27, 2011, respectively, Plaintiff Stephanie E. Cook ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of May 1, 2001, (Tr. at 204, 214), due to "bipolar, mood swing disorder, anxiety." (Tr. at 246). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 139, 144, 153, 160). Claimant filed a request for an administrative hearing, (Tr. at 167), which was held on August 14, 2012 before the Honorable I. K. Harrington, Administrative Law Judge ("ALJ"). (Tr. at 103-134). By written decision dated August 30, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 84-98). The ALJ's decision became the final decision of the Commissioner on October 21, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner subsequently filed a Brief in Support of Defendant's Decision, (ECF No. 13), to which Claimant filed a response. (ECF No. 14). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 24 years old at the time she filed the instant applications for benefits, and 25 years old on the date of the ALJ's decision. (Tr. at 95, 204, 214). She

completed the eighth grade in school and communicates in English. (Tr. at 95). Claimant has no past relevant work. *(Id.).*

## III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the

limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A

rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2011. (Tr. at 86, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 1, 2001, the alleged disability onset date. (Tr. at 86, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "depressive disorder, recurrent;

generalized anxiety disorder; personality disorder; and schizoaffective disorder, bipolar type." (Tr. at 87-89, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 89-91 Finding No. 4). Accordingly, she determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels. However, she does have some non-exertional limitations. Specifically, this individual is limited to performing simple, routine, and repetitive tasks. Also, she should have only occasional interaction with the public and coworkers.

(Tr. at 91-95, Finding No. 5). At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. at 95, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 95-97, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1987, and was defined as a younger individual age 18-49; (2) she had an eighth grade education and could communicate in English; and (3) transferability of job skills was not an issue because she did not have any past relevant work. (Tr. at 95-96, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 96-97, Finding No. 10); including work in medium, unskilled occupations, such as in the cleaning industry and bus room or dining room attendant positions, and light and unskilled occupations, such as cleaning positions. (Tr. at 96). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 97, Finding No. 11).

6

## IV.   <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant raises three challenges to the Commissioner's decision. (ECF No. 12 at 6). First, Claimant alleges that the Commissioner's decision is not based on substantial evidence because the ALJ's hypothetical questions to the vocational expert were incomplete. In particular, Claimant argues that the RFC assessment and the corresponding hypothetical questions do not adequately reflect the severity of her limitations as set forth by consulting psychologist, John Todd, Ph.D. (*Id.* at 6-8). Claimant points to Dr. Todd's findings of moderate limitations in the areas of concentration and maintaining attention; sustaining an ordinary routine; working with others; accepting instructions and criticism from supervisors; and getting along with coworkers; as well as his finding of marked limitation in Claimant's ability to interact with the general public. Claimant questions how restricting her to job positions that require simple, routine, and repetitive tasks and allow occasional interaction with the public and coworkers will actually account for all of the limitations identified by Dr. Todd.

Second, Claimant contends that the ALJ failed to evaluate the credibility of Claimant's sister, and ignored the function report supplied by Claimant's mother. (*Id.* at 8-10). Finally, Claimant alleges that the ALJ did not properly assess her credibility. (*Id.* at 12-20). According to Claimant, the ALJ discounted her statements based largely on the ALJ's misconception that Claimant was intentionally non-compliant with mental health treatment. However, the ALJ failed to appreciate that Claimant's non-compliance was due to the nature of her mental illness, the harsh side effects of her medication, and her lack of financial resources to pay for treatment. Claimant argues that the medical records and evaluations nevertheless corroborate the severity of her illness, and she

7

accuses the ALJ of selectively reading the records to ignore the disabling effects of her mental illness.

In response, the Commissioner argues that the ALJ relied upon evidence in the record in addition to the opinions supplied by Dr. Todd in formulating Claimant's RFC and the associated hypothetical questions posed to the vocational expert. Therefore, the RFC represented the ALJ's finding based upon a reading of the entire record, and the hypothetical questions fully and accurately reflected the RFC. In the Commissioner's view, the RFC was supported by substantial evidence, and thus the hypothetical questions were complete.  (ECF No. 13 at 9-12).

In regard to Claimant's other challenges, the Commissioner contends that the ALJ thoroughly discussed the testimony of Claimant's sister, affording it appropriate weight for lay testimony. Given that the report of Claimant's mother was duplicative of the testimony, which the ALJ had already addressed, the ALJ was not required to specifically mention the function report of Claimant's mother. (*Id.* at 12-13). Lastly, the Commissioner asserts that the ALJ adhered to the rulings and regulations in assessing Claimant's credibility, and there is substantial evidence in the record to support the ALJ's credibility assessment of the Claimant. (*Id.* at 13-18). Therefore, the Commissioner's decision is sound and should be affirmed.

## V.    <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### A. Treatment Records

On April 26, 2001, Claimant was admitted to Highland Hospital with symptoms

of extreme depression, poor impulse control, and poor anger management. (Tr. at 310). Treating physician, Dr. Dalrymple, performed a physical examination on April 27, 2001 which revealed depression, maxillary sinusitis, and hypertension. Tests conducted included a sleep deprived EEG, a CBC and a urinalysis, which were all found to be normal. A toxicology screen was negative for all substances tested. (*Id.*). Claimant was prescribed Wellbutrin and Risperdal, and she responded well to the medications. She began to participate actively in therapy and on the day of discharge, Claimant denied any depression. (*Id.*). Upon discharge on May 1, 2001, Dr. Gina Puzzuoli prescribed Claimant Wellbutrin SR, 100 mg every morning and Risperdal, 1 mg at bedtime. Claimant's prognosis was somewhat guarded due to the severity of her illness; however, Dr. Puzzuoli felt that with continued, consistent outpatient care and continued medication, Claimant's prognosis would dramatically improve. (Tr. at 310, 312).

Claimant was admitted to Highland Hospital once again on July 18, 2001, and upon admission, was extremely depressed with mood swings, suicidal, and homicidal thoughts. (Tr. at 308). Dr. Puzzuoli noted that Claimant had stopped taking her medications after her April 2001 discharge from Highland Hospital. (Tr. at 308-309). Claimant's EKG, CBC, and serum chemistry were within normal limits, and her urine drug screen was negative. (Tr. at 308). Claimant was placed back on medication and was reminded daily throughout the course of her admission about the importance of continuing the medication upon discharge. Medication compliance was also stressed to Claimant's mother, and both she and Claimant agreed to comply. (Tr. at 309). Discharge medications included Zyprexa 5 mg at bedtime and Celexa 20 mg every morning. Claimant's condition was noted to be improved at discharge from the hospital although her prognosis was still somewhat guarded based upon Claimant's non-compliance with

9

medication on an outpatient basis. (*Id.*).

According to the record, Claimant did not seek mental health treatment again for over four years when, at age eighteen, she voluntarily presented to Charleston Area Medical Center on May 21, 2006. (Tr. at 374). Claimant reported having suicidal and homicidal thoughts "forever," but having more of them in the last two days, including thoughts of walking out into traffic and of killing her boyfriend. She denied any other medical complaints except for a mild headache. (*Id.*). She stated that she had a history of bipolar disorder, but took no medications. Before Claimant could be fully assessed, she sneaked out of the Emergency Department. (Tr. at 375). After hospital personnel search unsuccessfully for her, the police were notified. Subsequently, hospital personnel spoke with Claimant's father, who reported Claimant was at home, in bed, and was not suicidal. He questioned why the police were even contacted. He was told to bring Claimant back to the hospital, but he refused to bring her back or divulge her address. (*Id.*).

Beginning in September 2006 and continuing through May 5, 2011, Claimant sought treatment at Charleston Area Medical Center for serum blood tests; abdominal pain; headache; epigastric pain; incision infection status post laparoscopic assisted cholecystectomy; dog bite; bronchitis; dizziness and weakness; and facial injury diagnosed as closed head injury. (Tr. at 376-392, 394-395). However, there is no mention of prior mental health issues in these records other than a June 6, 2007 Emergency Department evaluation where it is noted that Claimant reported being allergic to Wellbutrin and Risperdal, two medications used to treat psychiatric conditions. (Tr. at 383).

Claimant did not seek mental health treatment again until May 16, 2011 when she

10

was seen at Prestera Centers for Mental Health ("Prestera") for a mental health assessment. (Tr. at 359). Claimant reported she had been depressed since childhood, had ten prior suicide gestures, and two prior psychiatric hospitalizations. (*Id.*). On this date, she complained of disturbed sleep and appetite, racing thoughts, irritability, crying spells, and suicidal ideation. She also complained of anxiety, panic, and poor response to medications. (*Id.*). Claimant's appearance, speech, thought content, and recall memory were within normal limits. (Tr. at 360). Sociability was isolation, and her affect was blunted. (Tr. at 360-361.) Claimant was diagnosed with major depressive disorder, recurrent, moderate, and was given a GAF[1] score of 46.[2] (*Id.*)

Claimant presented to Prestera on May 18, 2011 to attend interchange and counseling. Claimant complained of depression, suicidal ideation, and social anxiety. (Tr. at 363). She reported low energy levels, tearfulness, hopelessness, helplessness, panic attacks, fear of people in public, racing thoughts, poor concentration, easy distractibility, and verbal aggression. Claimant also stated that she had never stabilized on her medications. (*Id.*). Claimant was scheduled to participate in group therapy, have individual therapy, and to be seen by a staff psychiatrist. (Tr. at 364). Claimant's appearance, speech, thought content, and recall memory were all documented to be within normal limits. (*Id.*). However, her sociability was noted as withdrawn, her coping

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders ("DSM")*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). In the past, this tool was regularly used by mental health professionals; however, in the DSM-5, the GAF scale was abandoned, in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM-5 at p. 16. Americ. Psych. Assoc, 32 (5th Ed. 2013)

[2] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

ability was assessed as overwhelmed, and her affect was broad. (Tr. at 364-365). Claimant received a diagnosis of major depressive disorder, recurrent moderate, chronic, and a GAF score of 35.[3] (Tr. at 365-366).

Prestera psychiatrist, Dr. Prathima Bodala, performed an initial psychiatric evaluation of Claimant on May 19, 2011. (Tr. at 367-68). Claimant reported that she was a divorced, 23-year old, with no children, who had been unemployed for one year and had tried various jobs but was unable to keep them due to "severe mood swings and anxiety." (Tr. at 367). In addition to severe mood swings, she reported severe anxiety in group settings, problems with social situations, suicidal and homicidal thoughts, as well as depression. She also reported paranoia and visual hallucinations and stated she used to cut herself in the past, "not anymore." (*Id.*). Claimant indicated that she was allergic to Wellbutrin and Risperdal; however, Dr. Bodala believed it was more likely that Claimant could not tolerate the severe side effects of the medicines. (*Id.*). Claimant was diagnosed with schizoaffective disorder-bipolar type; social anxiety disorder; borderline traits (cutting could be due to paranoia); and a GAF score of 35. (Tr. at 368). Claimant was placed in group therapy while she waited for an opening in individual therapy. She was prescribed Haldol 5 mg po bid to control the psychosis. (*Id.*) On June 2, 2011, Claimant was discharged from the program at Prestera as she had dropped out of treatment and rejected additional therapy. (Tr. at 406). According to the record, even though Claimant was not attending additional group therapy sessions, it was felt that she would benefit by following a medication protocol. She did qualify for medication

---

[3] A GAF score of 31-40 indicates that the patient had some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

services and was to be notified of an appointment with a physician for medication management, but apparently did not return. (*Id.*).

Claimant next sought treatment at Charleston Area Medical Center on December 28, 2011 for back pain status post motor vehicle collision. (Tr. at 399). She returned to Charleston Area Medical Center on May 18, 2012 complaining of back pain due to heavy lifting. (Tr. at 403). Her past medical history was reported as negative and she was currently not taking any medications. (*Id.*). Claimant was seen once again in the Emergency Department at Charleston Area Medical Center on June 21, 2012, complaining of tooth pain due to a broken tooth in the lower left jaw. Her past medical history noted anxiety and depression. (Tr. at 411). The examining physician noted Claimant was a well-developed, obese female that appeared very tearful. Claimant was prescribed Amoxicillin and Lortab and was discharged as stable.

### B. Evaluations and Opinions

On July 5, 2011, an Adult Mental Status Examination was performed by Kara Gettman-Hughes, M.A. (Tr. at 316). Claimant reported a history of episodic depression; feelings of sadness, helplessness and hopelessness, loss of interest in activities, easily crying for no reason, panic attacks and auditory and visual hallucinations. (Tr. at 13). Claimant's treatment for mental health issues was reported to have initiated at age 16 for depression and her last treatment was with Prestera; however, "they wanted her to participate in group therapy, so she quit going." (*Id.*). On examination, Claimant was cooperative, her eye contact was fair, speech was responsive, thought processes were understandable and connected, and there was no evidence of delusions or obsessive compulsive tendencies. (Tr. at 318). Claimant's social functioning was mildly impaired based on clinical observations including eye contact, sense of humor, and mannerisms.

(Tr. at 319). Claimant's recent memory was mildly impaired based upon her performance on the Memory Subtest of Cognistat, and her remote memory was fair based on recall of personal history. (*Id.*). Claimant's concentration was found to be moderately impaired based on a Digit Span scaled score of 4; her persistence was mildly impaired based on ability to remain focused on task, and her pace was found to be normal. (*Id.*). Claimant reported she was capable of performing her activities of daily living including some housework, sweeping, washing dishes, and doing laundry. Her daily activities primarily involved watching television, listening to the radio, drawing, and writing. (Tr. at 320). Based upon the record review and examination, Ms. Gettman-Hughes diagnosed Claimant with major depressive disorder, recurrent, moderate with a history of psychotic features, generalized anxiety disorder, and panic disorder without Agoraphobia; and personality disorder, not otherwise specified with Cluster A and B Traits. (Tr. at 319). Ms. Gettman-Hughes believed Claimant's prognosis to be poor, but opined that Claimant was capable of managing her funds should benefits be awarded. (Tr. at 320).

John Todd, Ph.D, issued a Psychiatric Review Technique report on July 15, 2011. (Tr. at 324). He found that Claimant had a mild degree of limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence and pace; however, there were no episodes of decompensation. (Tr. at 334). Dr. Todd opined that the evidence did not establish the presence of the "C" criteria. (Tr. at 335). He felt Claimant appeared mostly credible with reported past psychiatric treatment and medications. Dr. Todd noted there was a report of hallucinations, although only when Claimant was severely depressed, and none were noted at her evaluation. Claimant completed her own forms indicating

14

that she needed reminders for medication, but otherwise Claimant conceded that she could perform daily activities independently. (Tr. at 336). Dr. Todd found there was no evidence of severe limitations due to a mental disorder, and he felt that Claimant did not have a severe mental impairment. (*Id.*).

On August 11, 2011, Dr. Todd completed a second Psychiatric Review Technique after reviewing additional records. (Tr. at 338-348). This time, he found Claimant had a marked degree of limitation in activities of daily living, and moderate difficulties in maintaining social function, concentration, persistence and pace. He also found that there were one or two episodes of decompensation. (Tr. at 348). Dr. Todd noted that the evidence did not establish the presence of paragraph "C" criteria. (Tr. at 349). Based upon his review, Dr. Todd felt a Mental Residual Functional Capacity Assessment ("MRFC") was required. (Tr. at 350). By report of the same date, Dr. Todd completed a MRFC, concluding that Claimant had the mental residual functional capacity for "simple, routine, repetitive two-step worklike [sic] activities with limited contact with others or the need for feedback." (Tr. at 352-355).

Jeff Harlow, Ph.D completed a case analysis on October 27, 2011 in which he reviewed and affirmed Dr. Todd's second set of findings "in light of an analysis of the file, which indicates that there is zero evidence of new mental health treatment since the date of the initial assessment." (Tr. at 357). Dr. Harlow noted that Claimant reported no change in her mental condition and no new mental illnesses or mental limitations. (*Id.*).

## VI.   **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  <u>Discussion</u>

Each of Claimant's three challenges will be addressed in turn.

### A.  *Incomplete Hypothetical Questions*

Claimant contends that the ALJ erred by failing to ask the vocational expert hypothetical questions that accurately reflect the severity of the limitations caused by her mental impairment. Claimant points out that Dr. Todd, a non-examining agency

consultant, found her to have marked limitations in her ability to interact appropriately with the public and moderate limitations in other areas of social functioning, as well as her ability to concentrate, and in her persistence and pace. Yet, the ALJ did not expressly account for these restrictions in the hypothetical questions posed to the vocational expert. Instead, she asked the vocational expert to assume that Claimant was limited to simple, repetitive, and routine tasks with only occasional exposure to coworkers and the public. Claimant cites to a number of cases in which courts have found similar hypothetical questions to provide an insufficient basis for a valid expert opinion where the claimant had moderate limitations in concentration, persistence, or pace.

It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen,* 889 F.2d 47, 50-51 (4th Cir. 1989). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC finding that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006). "[I]it is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F.App'x 359, 364 (4th Cir. 2006). A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted).

Here, the ALJ asked hypothetical questions that closely tracked Claimant's RFC as determined by the ALJ and summarized in Finding No. 5 of the written decision. (Tr.

17

at 91). She asked the vocational expert to assume that the hypothetical individual was limited to "work involving simple, routine, repetitive tasks; occasional interaction with the public and co-workers," precisely the same limitations she included in Claimant's RFC finding. (Tr. at 128). Thus, Claimant attacks the RFC finding in conjunction with the hypothetical questions. For that reason, an examination of the adequacy of the RFC finding is in order.

Social Security Ruling 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

18

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. A proper RFC assessment requires the ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

Therefore, in considering allegations of symptoms such as pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the Claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In assessing Claimant's RFC, the ALJ conducted a thorough review of the evidence. (Tr. at 91-95). She discussed the symptoms alleged by Claimant, Claimant's

19

treatment history, family and living situation, the testimony of Claimant's sister, the consultative examination, and the consultant's opinions. The ALJ explained that after considering all of this information, she concluded that although Claimant's psychological problems could reasonably be expected to cause the symptoms about which she complained, the ALJ did not believe that the resulting functional limitations were as severe as they were alleged to be by Claimant. (Tr. at 93). The ALJ then outlined the evidence that contradicted Claimant's position, pointing first to her lack of compliance with medication protocols. The ALJ noted several medical entries confirming that Claimant had good symptom control when taking her prescribed medications. The ALJ also remarked that Claimant had sporadic and inconsistent mental health treatment, going extended periods of time between visits. Given the long gaps between treatment, the ALJ rejected the GAF scores given at mental health visits, stressing that the scores could only reflect Claimant's mental functioning at one point in time and did not provide the longitudinal view useful to a disability determination.

Next, the ALJ analyzed the examination of Ms. Gettman-Hughes, a consultative psychologist. (Tr. at 94). The ALJ accepted Ms. Gettman-Hughes's findings that Claimant had moderate limitations in the area of concentration, persistence, or pace. According to the ALJ, she accounted for that level of limitation in the RFC by restricting Claimant to simple, routine, repetitive tasks with occasional interaction with the public and co-workers. The ALJ specifically rejected Ms. Gettman-Hughes's finding that Claimant had only mild limitation in social functioning. Instead, the ALJ felt that Claimant's history of mental health problems and the testimony at the hearing supported a finding of moderate limitation in that functional area. (Tr. at 94). However, the ALJ believed that her RFC assessment also fully accounted for that moderate

limitation. Finally, the ALJ discussed the opinions of non-examining consultants, Dr. Todd and Dr. Harlow, confirming that their opinions were consistent with her summary RFC finding. (Tr. at 95).

Claimant argues that the ALJ gave great weight to Dr. Todd's opinions, and Dr. Todd found Claimant to be markedly limited in her ability to interact with the public and moderately impaired in concentration, persistence and pace. More importantly, Claimant alleges, Dr. Todd noted in his function-by-function summary conclusions that Claimant had certain specific abilities that were more limited than others, yet the RFC finding does not include, or adequately account for, these specific limitations. As a result, the RFC finding and the hypotheticals incorporating the RFC finding do not convey Dr. Todd's opinions and, thus, they are flawed.

A review of the written decision negates Claimant's argument for two obvious reasons. First, the ALJ did not explicitly accord great weight to Dr. Todd's function-by-function summary conclusions, which would include the marked limitation in the ability to interact appropriately with the public and some of the other specific abilities that Dr. Todd was asked to consider separately. Instead, in regard to the mental residual functional capacity assessment form, the ALJ only specifically mentioned Dr. Todd's opinion that "claimant appeared to retain the mental capacity to perform simple, routine, and repetitive two-step [work-like] activities, with limited contact with others and no need for feedback." (*Id.*). According to the ALJ, this opinion was consistent with the treatment records, which indicate that Claimant had social phobias and difficulty in concentration, and with the testimony of Claimant's sister regarding Claimant's difficulty with strangers and large groups.

Second, the ALJ clearly states in the written decision that based upon the

evidence and opinions as a whole, Claimant had moderate limitations in concentration, persistence, and pace, and moderate limitations in social interaction across the board. (Tr. at 94-95). These findings were absolutely consistent with the paragraph B findings of Dr. Todd and Dr. Harlow, and somewhat more generous to Claimant than some of the findings made by Ms. Gettman-Hughes. The ALJ also worded her RFC finding to integrate the RFC assessment provided by Dr. Todd, albeit not his individual function-by-function summary conclusions. However, it is important to note that Dr. Todd did not incorporate any of the specific limitations mentioned by Claimant into his RFC assessment either. As the mental residual functional capacity assessment form indicates, the function-by-function summary conclusions are used to form the basis of the RFC assessment. The RFC assessment is intended to convey in useful terms the claimant's residual capacity to perform basic work activities when taking into account her limitations. It is not meant to be a regurgitated list of the claimant's especially challenging activities. Evidently, the ALJ accepted that Claimant's limitations in the area of social functioning were moderate rather than mild, but they were not marked in any area. Thus, while the ALJ gave substantial weight to the opinions of all of the consulting experts, she plainly did not adopt *en toto* the opinions of any of them. As the Commissioner points out, the ALJ may give great weight to an expert's opinion without incorporating every finding, limitation, and assessment contained in the expert's record. *See, e.g., Laing v. Colvin,* No. SKG–12–2891, 2014 WL 671462, at *10 (D.Md. Feb. 20, 2014) ("Although the ALJ accorded 'great weight' to the state agency psychologists, he was not required to adopt every single opinion set forth in their reports.") (citing *Bruette v. Comm'r Soc. Sec.,* No. SAG–12–1972, 2013 WL 2181192, at *4 (D.Md. May 17, 2013). Therefore, the ALJ followed the proper steps in crafting Claimant's RFC.

Having resolved the issue related to the manner in which the ALJ determined Claimant's RFC, the only question remaining is whether the RFC finding used in the hypothetical questions adequately conveys the limitations that the ALJ indisputably found—that being, moderate limitations in Claimant's concentration, persistence, pace, and social functioning. Courts across the country and within this circuit are split on the question of whether a claimant's moderate impairments in concentration, persistence, pace and social functioning can be sufficiently addressed by an RFC finding and corresponding hypothetical questions restricting the claimant to simple, repetitive, routine work with only occasional interaction with others. For example, in *Tune v. Astrue,* the Court determined that an RFC assessment limiting the claimant to "unskilled, simple, and repetitive work [with] only frequent, not constant, contact with the general public" did not adequately incorporate the ALJ's findings that claimant had moderate difficulties in social functioning and in maintaining concentration, persistence, or pace. *Id.,* 760 F.Supp.2d. 555, 563 (E.D.N.C. 2011), The Court explained:

> Numerous courts have admonished ALJ's for presenting simplified mental RFC findings to the [vocational expert] that did not encompass all of the findings made in the decision. *See e.g. Conley v. Astrue,* 692 F.Supp.2d 1004, 1008 (C.D.Ill. 2010) ("In general, an ALJ cannot 'translate' a mental limitation into words describing work such as unskilled, simple, repetitive, routine, one- or two-step, or any similar characterization, because these descriptions may not account for all the limitations a doctor meant to convey" *citing Stewart v. Astrue,* 561 F.3d 679, 684–685 (7th Cir. 2009) and *Craft v. Astrue,* 539 F.3d 668, 677–678 (7th Cir. 2008)); *Edwards v. Barnhart,* 383 F.Supp.2d 920, 930–931 (E.D.Mich. 2005) (finding that "jobs entailing no more than simple, routine, unskilled work" do not convey moderate limitations in ability to concentrate, persist, and keep pace); *Whack v. Astrue,* 2008 WL 509210, at *8 (E.D.Pa. 2008) (citing cases for the proposition that restrictions of "simple" or "low-stress" work do not sufficiently incorporate the claimant's medically established limitations where claimant has moderate deficiencies in concentration, persistence or pace).

23

*Id.* Finding no clarification in the ALJ's decision for how he arrived at the RFC findings conveyed to the vocational expert, the Court remanded the case for further proceedings. *See also Goepper v. Colvin*, 2014 WL 6490191, at *3-4 (W.D.Va. Nov. 19, 2014) (Court cannot accept proposition that a limitation to simple, routine, repetitive tasks subsumes moderate limitations on concentration, persistence, or pace); *Wiederholt v. Barnhart,* 121 F.App'x 833, 839 (10th Cir. 2005) ("The relatively broad, unspecified nature of the description "simple" and "unskilled" does not adequately incorporate the ALJ's additional, more specific findings" such as moderate difficulties maintaining concentration, persistence, or pace); *Chavanu v. Astrue,* 2012 WL 4336205, at *9 (M.D. Fla.) (citing cases from several circuits that have found "that restricting [a] VE's inquiry to simple, routine, or repetitive tasks, or unskilled work does not accounts [sic] for a plaintiff's moderate deficiencies in concentration, persistence, or pace"); *Brink v. Comm'r. of Soc. Sec. Admin.,* 343 F.App'x 211, 212 (9th Cir. 2009) (When the ALJ found claimant to be limited in maintaining concentration, persistence, or pace, a hypothetical question to the vocational expert restricting claimant to "simple, repetitive work," without including claimant's difficulties with concentration, persistence, or pace resulted in an expert's conclusion that was based on an incomplete hypothetical question.)

In contrast, the Court in *Powell v. Astrue* held that an RFC limiting the claimant to "unskilled tasks" took proper account of the claimant's moderate impairment in concentration, persistence, and pace. *Id.,* No. CIV. SKG 10–02677, 2013 WL 3776948, at *10 (D.Md. July 17, 2013) (citing *Fisher v. Barnhart,* 181 F.App'x 359, 364 (4th Cir. 2006); *Bantley v. Chater,* No. 96–1782, 1997 WL 232303 (4th Cir. 1997)). The Court noted that other courts in the Fourth Circuit have held similarly, including:

24

> *Mills v. Astrue,* Civil Action No. 2:11–cv–65, 2012 U.S. Dist. LEXIS 80695, at \*60, 2012 WL 2030066 (N.D.W.Va. 2012) ("the ALJ's decision that Plaintiff can engage in simple, unskilled work despite moderate limitations in concentration, persistence, and pace is supported by substantial evidence, and the hypothetical to the VE was appropriate"); *Sensing v. Astrue,* C/A No. 6:10–cv–03084–RBH, 2012 U.S. Dist. LEXIS 40653, at \*20, 2012 WL 1016581 (D.S.C. 2012) (limiting hypothetical question to work that includes only simple one to two-step tasks and avoiding contact with the public sufficiently accounts for limitations in concentration, persistence, and pace); *Melgarejo v. Astrue,* Civil No. JKS 08–3140, 2009 U.S. Dist. LEXIS 116662, at \*6, 2009 WL 5030706 (D.Md. 2009) (limiting claimant to unskilled work properly addresses mild-to-moderate difficulties in concentration, persistence, and pace).

*Id. See also Farrell v. Colvin,* No. TMD 11–2995, 2014 WL 1764928, at \*15 (D.Md. Apr. 30, 2014) ("[A] limitation to simple, routine, and unskilled tasks accommodates a moderate limitation in maintaining concentration, persistence, or pace."); *Bishop v. Astrue,* No. 09-cv-1956, 2010 WL 3397526, at \*10 (D.S.C. Aug. 26, 2010) ("[W]ork in a low-stress environment with only occasional exposure to the general public accommodated Plaintiff's diminished ability to concentrate."); *Davis v. Commissioner,* ___F.Supp.2d___, 2014 WL 1292884, at \*10 (M.D.Fla. Mar. 28, 2014) ("Eleventh Circuit caselaw holds that a limitation to simple, routine tasks adequately addresses a plaintiff's moderate limitations in concentration, persistence, or pace where the record shows that the plaintiff could perform such tasks."); *Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001) (When the physician who finds a claimant to have moderate limitations in concentration, persistence and pace also prepares a functional capacity assessment describing the claimant as being able to perform "simple, repetitive, and routine" tasks, then the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures the claimant's deficiencies in concentration, persistence or pace.); *Bordelon v. Astrue,* 281 F.Appx. 418, 423 (5th Cir. 2008) ("[R]estrictions to rare public interaction, low stress, and simple, one- to two-

step instructions reflect that the ALJ reasonably incorporated Bordelon's moderate concentration, persistence, and pace limitations such that the hypothetical question was proper.")

Having reviewed a number of cases taking contrary positions on this issue, the undersigned finds the most reasonable approach to be the one set forth in *Schanck v. Comm'r of Soc. Sec.,* No. 12-14837, 2014 WL 1304816, at *7-8 (E.D.Mich. Mar. 31, 2014). In *Schanck*, the Court started by taking note of the relevant authority on both sides of the issue and agreed that "a hypothetical limiting a claimant to simple, routine tasks or one and two-step tasks may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace, because the difficulty of a task does not always equate with the difficulty of staying on task." *Id.* at *7. Nevertheless, the Court went on to emphasize that "no bright-line rule [exists] requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' or 'one- and two-step tasks,' but excludes a moderate limitation in concentration." *Id.* at *8. Rather, the Court suggested, the reviewing court should examine each case individually, scrutinizing the record as a whole, to determine in that particular case, if the limitations stated in the RFC assessment and hypothetical questions (1) suitably accommodate the mental limitations found by the ALJ, and (2) are supported by substantial evidence. *Id. (*citing *Hess v. Comm'r of Soc. Sec.,* No. 07-13138, 2008 WL 2478325 (E.D.Mich. June 16, 2008) and *Sutherlin v. Comm'r of Soc. Sec.,* No. 10–10540, 2011 WL 500212, at *2 (E.D.Mich. Feb.8, 2011) ("[T]he [ALJ] was not required to incorporate the broad terminology of the [moderate concentration, persistence, or limitations] verbatim. Rather, as required, the [ALJ] carefully considered and evaluated the credibility of all the relevant evidence when making the [RFC] determination and transforming

[Plaintiff]'s restrictions into concrete terms.")

Claimant contends that the ALJ's hypothetical restriction to simple, routine, repetitive tasks with only occasional interaction with the public and coworker fails to convey the functional limitations set forth by Dr. Todd in his mental residual functional assessment. In Claimant's view, this simplistic translation of Dr. Todd's more multifaceted findings cannot properly account for Claimant's moderately impaired concentration, persistence, pace; limitations in dealing with supervisors; and marked issues with the general public. The primary weakness with this position, however, is that in this case, we know that the ALJ's RFC finding conveys precisely the meaning intended by Dr. Todd because Dr. Todd essentially provided the RFC finding used by the ALJ. After Dr. Todd completed the function-by-function summary conclusions, he was asked to provide a functional capacity assessment based upon those summary conclusions. (Tr. at 354). Dr. Todd opined that "[t]he claimant appears to retain the mental capacity for simple routine repetitive 2 step workilike [sic] activities [with] limited contact [with] others or the need for feedback." (*Id.*). Thus, the ALJ based her RFC finding and corresponding hypothetical questions squarely on Dr. Todd's statement. Accordingly, the hypothetical questions undoubtedly accommodated the mental limitations that Dr. Todd intended to convey. *See Wooldridge v. Colvin,* 2013 WL 6506206, at *5-6 (W.D.Va., Dec. 11, 2013) (holding that ALJ's RFC findings and hypothetical questions were supported by substantial evidence when they conveyed the physician's opinions as a whole rather than an isolated assessment). For that reason, the undersigned **FINDS** that Claimant's challenge to the hypothetical questions is without merit. The undersigned further **FINDS** that the RFC finding and the corresponding hypothetical questions based on the RFC finding were determined using a correct

application of the law and are supported by substantial evidence.

### B. Treatment of Lay Witnesses

Claimant argues that the ALJ erred by failing to properly evaluate the credibility of her sister, Kristen Jackson, and by ignoring a function report submitted by her mother. In Claimant's view, these witnesses were particularly important to her case given her lack of treatment records. She contends that both Ms. Jackson and her mother can provide longitudinal perspective on her mental illness, as both women have had substantial contact with Claimant over the years. Claimant complains that despite the wealth of corroborating information available through these sources, the ALJ virtually disregarded them.

According to Social Security Ruling 06-03P, an ALJ will consider all of the evidence in a claimant's file when making a disability determination. SSR 06-03P, 2006 WL 2329939, at *1. This includes evidence from acceptable medical sources, other medical sources, and non-medical sources. While non-medical sources are not qualified to establish the existence of a medically determinable impairment, information from these sources may be helpful "to provide insight into the severity of the individual's impairment(s) and how it affects the individual's ability to function." *Id.* at *2. The Ruling divides non-medical sources into two categories; non-medical sources who have contact with the claimant in a professional capacity, such as teachers, school counselors, and social welfare workers; and non-medical sources who have not seen the claimant in a professional capacity, such as spouses, parents, friends, and neighbors. *Id.* at 3. The Ruling also makes a distinction between how evidence from the two types of non-medical sources will be evaluated and discussed. For instance, when considering an opinion from a non-medical source that has seen the claimant in a professional capacity,

the ALJ should consider such factors as the nature and extent of the relationship between the source and the claimant; the source's qualifications; the source's area of specialty or expertise; the degree to which the source presents relevant evidence to support his or her opinion; the consistency of the opinion with other evidence in the record; and other factors that tend to support or refute the opinion. 2006 WL 2329939, at *6. Moreover, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at 6. On the other hand, when evaluating evidence from non-medical sources that have not seen the claimant in a professional capacity, the ALJ need only "consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.* at *6. Furthermore, there is no specific requirement in the Ruling that the ALJ discuss or explain what evidentiary weight is given to this type of non-medical, other source evidence. *Id.* Indeed, as a general rule, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F.Supp.2d 590, 602 (E.D.N.C. 2010); *see also Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").

In her written decision, the ALJ explicitly discussed the testimony of Claimant's sister, Kristen Jackson. (Tr. at 92). In part based upon Ms. Jackson's testimony, the ALJ disagreed with the conclusion of the examining psychologist, Ms. Gettman-Hughes, who determined that Claimant was only mildly limited in social functioning, and found

Claimant to have moderate limitations in that functional area. (Tr. at 94). The ALJ reiterated her reliance on Ms. Jackson's testimony when she discussed Dr. Todd's mental residual functional capacity evaluation. The ALJ gave great weight to Dr. Todd's opinion that Claimant retained the mental capacity to perform simple, routine, repetitive, two-step work-like activities, with limited contact with others and no need for feedback, explicitly stating that this opinion was consistent with Claimant's treatment records and "with the testimony of the claimant's sister, who indicated that the claimant has difficulty addressing strangers or interacting in large groups." (Tr. at 95). Accordingly, contrary to Claimant's contention, the ALJ did not err in her evaluation of Ms. Jackson's testimony. The ALJ obviously considered the testimony to be credible, and also found it to be consistent with her findings. Therefore, the undersigned **FINDS** that the ALJ properly considered the testimony of Claimant's sister. To the extent that Claimant's argument is with the ALJ's interpretation of Ms. Jackson's testimony, rather than the attention given to it, the Court is not charged with reviewing the evidence *de novo* and making determinations regarding its weight or value.

In regard to the function report prepared by Claimant's mother, as previously stated, the ALJ need not comment on every piece of evidence in the record. In the report, Claimant's mother stated that Claimant was lax in her personal grooming, was easily distracted, was angry and aggressive, was very limited in her social contacts, stayed cloistered in her bedroom, thought people were talking about her, had panic attacks in public settings, could not follow instructions, and did not like change. (Tr. at 271-78). However, Claimant and her sister also supplied this information. In the written decision, the ALJ thoroughly discussed Claimant's symptoms, including her difficulty with concentration and around large groups of people, her paranoia and panic attacks,

30

her limited contact with people other than family members, her angry outbursts, inability to complete tasks, and problems with change. (Tr. at 93). Consequently, even if the ALJ had an obligation to discuss her assessment of the function report prepared by Claimant's mother, which the ALJ did not, her failure to do so would be harmless error. Courts have routinely applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *See, e.g., Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D.Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)). The Fourth Circuit has applied a similar analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 F.App'x 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 F.App'x 265, 268 (4th Cir. 2003) (unpublished). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983); *Burch v. Astrue,* 2011 WL 4025450 (W.D.N.C., July 5, 2011), (*citing Camp v. Massanari,* 22 F.App'x 311 (4th Cir.2001)) (Claimant must show that absent error, the decision might have been different). In light of the ALJ's robust discussion of Claimant's symptoms, which were merely repeated in the function report, the undersigned **FINDS** that the ALJ did not err in failing to specifically discuss the function report.

### C.  *Claimant's Credibility*

Finally, Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to properly assess her credibility. In particular, Claimant argues that the reasons given by the ALJ for discounting Claimant's

statements regarding the disabling effects of her mental impairments do not withstand scrutiny. The ALJ found Claimant's non-compliance with her medication regimen, the lack of identified side effects from medication, Claimant's sporadic mental health treatment, her periodic improvement, and the extent of her daily activities all provided evidence that contradicted Claimant's statements regarding the persistence and severity of her mental health symptoms. Claimant contends that the ALJ simply misread the record, or disregarded parts of the record that conflicted with her conclusions. For example, Claimant stresses that while she did have medication lapses in her medical history, the ALJ failed to appreciate that non-compliance with treatment is a hallmark of bipolar disorder, one of Claimant's severe impairments. In addition, although all of the side effects to her psychotropic medications were not delineated, the medical records clearly documented that Claimant complained of side effects so severe that she was unable to tolerate the medications. Claimant also maintains that the ALJ erred by finding gaps in her mental health treatment to be evidence of Claimant's lack of credibility. According to Claimant, under Social Security Ruling 96-7p, the ALJ must allow Claimant an opportunity to explain the lack of treatment before drawing any negative conclusions. In this case, Claimant alleges that she avoided treatment for two reasons. First, she was unable to afford it, and second, her social phobia prevented her from participating in some of the treatment ordered, such as group therapy. Finally, Claimant argues that the ALJ greatly overestimated the weight of her daily activities as proof of non-disability. Claimant emphasizes that being able to dress, watch television, read, and listen to music alone in the privacy of her bedroom does not discredit her claim that she is unable to function in crowds, get along with others, concentrate on work activities, and carry out the duties of an employee for an eight-hour workday.

Pursuant to the Regulations, the ALJ evaluates a claimant's credibility using a two-step process. 20 C.F.R. § 404.1529. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, such as pain and mental distress. *Id.* § 404.1529(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.*

§§ 404.1529(c)(1), 416.929(c)(1); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. The ALJ may not reject a claimant's allegations of the intensity and persistence of symptoms solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give

specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided an overview of Claimant's testimony, which she then compared to the relevant medical evidence, consultative evaluations, and testimony in order to assess Claimant's credibility. (Tr. at 91-95). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but her statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC finding. (Tr. at 93). First, the ALJ acknowledged Claimant's bipolar disorder, panic attacks, poor impulse control, and angry outbursts, which led to her social isolation and depression. However, as the ALJ noted, Claimant's medical records established that with proper medication and therapy, Claimant had a significant reduction of symptoms. (Tr. at 93).

Referencing an admission to Highland Hospital in 2001, the ALJ indicated that after a five days of treatment, Claimant denied having depression and was reported to have good control of her anger and good impulse control. (*Id.*). The ALJ added that this same positive outcome was repeated in a second hospitalization a few months later. Once again, after just six days of treatment, Claimant had documented improvement in her symptoms. (*Id.*).

The ALJ next considered Claimant's sporadic mental health treatment, commenting that Claimant had no treatment between 2002 and 2005; she went to the emergency room once in 2006 complaining of suicidal and homicidal ideations, but left without being seen; and then sought no treatment between 2007 and 2010. (Tr. at 93). In May 2011, around the time she filed applications for disability benefits, Claimant initiated treatment at Prestera. The ALJ recognized Claimant's low GAF scores at that time, but found they were not reliable as primary evidence of her allegations given her longstanding lack of treatment. Certainly, under SSR 96-7p, the ALJ correctly considered Claimant's lack of treatment history. As the Ruling provides, a claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the [claimant] is not following the treatment as prescribed and there are no good reasons for this failure." 1996 WL 374186, at *7. The Ruling cautions the ALJ not to draw inferences about the severity of a claimant's symptoms based upon lack of treatment without first investigating the reasons for gaps in care. Claimant contends that the ALJ failed to investigate the "good reasons" for her lack of treatment and failure to comply with prescribed treatment, including indigency and the nature of mental illness itself. However, the record demonstrates that Claimant's counsel provided these reasons to the

ALJ at the outset of the administrative hearing, explaining that Claimant's social anxiety prevented her from receiving treatment since no physician would treat her unless she agreed to group therapy, and she could not afford other treatment given that she had no income and no medical card. (Tr. at 107). Nonetheless, the ALJ is not required to accept the explanations provided by the Claimant. Indeed, the Ruling states only that the explanations "may provide insight into the [claimant's] credibility," not that an excuse, even when verified, acts to rehabilitate the claimant's credibility. *Id.*

The ALJ also indicated that her credibility assessment of Claimant was based in part on the findings made by Ms. Gettman-Hughes during the consultative psychological examination. (Tr. at 94). Specifically, Ms. Gettman-Hughes found Claimant to have only mild impairment in social functioning, memory, judgment, and persistence, with moderate impairment in her ability to concentrate, but her pace, thought processes, speech, and cooperation were all normal. When considering these results in combination with Claimant's daily activities, Dr. Todd's mental RFC assessment, the testimony at the hearing, and the other factors discussed, the ALJ concluded that to the extent Claimant alleged that her symptoms precluded her from working, her allegations were not credible. In response, Claimant argues that "[n]o reasonable fact finder could conclude that [her] daily activities as described [by her, her sister, and her mother] could permit competitive employment." (ECF No. 14 at 13). To begin with, Claimant's daily activities were not considered in isolation. Additionally, Claimant must bear in mind that the ALJ's task is to determine the ***most*** sustained work-related physical and mental activities that Claimant is capable of doing in a work setting on a regular and continuing basis despite her limitations. What Claimant is currently doing on a daily basis does not necessarily reflect the ***most*** that she is capable

of doing. Accordingly, evidence of her daily activities is but one piece of the puzzle.

Having thoroughly reviewed the record, the undersigned **FINDS** that the ALJ performed a thorough analysis of the evidence and carefully weighed Claimant's statements against the objective medical findings, medical source opinions, activities of daily living, and other evidence in the record. She then fully explained her reasons for discounting Claimant's allegations regarding the disabling effects of her impairments, pointing to specific pieces of evidence that she felt diminished Claimant's credibility. Clearly, the ALJ complied with the two-step process and provided a reasonable explanation supported by substantial evidence. Consequently, the undersigned **RECOMMENDS** that the District Court **FIND** that the ALJ followed the proper agency procedures in assessing Claimant's credibility and further recommends that the District Court **FIND** that the ALJ's credibility assessment is supported by substantial evidence on record.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 12), **GRANT** the Commissioner's request to affirm, (ECF No. 13), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 5, 2015

_____
Cheryl A. Eifert
United States Magistrate Judge